450 F.3d 205
 UNITED STATES of America, Plaintiff-Appellee,
v.
CERTAIN LAND SITUATED IN THE CITY OF DETROIT, WAYNE COUNTY, State of Michigan; Nash P. Sogoian; Treasurer of the City of Detroit, Defendants,
The Detroit International Bridge Company, Defendant-Appellant,
Commodities Export Company, a Michigan Corporation; and Walter H. Lubienski, Intervenors.
 No. 04-1052.
 United States Court of Appeals, Sixth Circuit.
 Argued: November 29, 2005.
 Decided and Filed: June 8, 2006.
 
 ARGUED: Craig L. John, Dykema Gossett, Bloomfield Hills, Michigan, for Appellant. Jennifer L. Scheller, U.S. Department of Justice, Washington, D.C., for Appellee. ON BRIEF: Craig L. John, Mark H. Sutton, Dykema Gossett, Bloomfield Hills, Michigan, for Appellant. Stephanie Tai, U.S. Department of Justice, Washington, D.C., for Appellee.
 Before: NORRIS and BATCHELDER, Circuit Judges; RICE, District Judge.*
 OPINION
 ALAN E. NORRIS, Circuit Judge.
 
 
 1
 This appeal represents the culmination of a protracted condemnation proceeding the length of which calls Dickens' Bleak House to mind. Detroit International Bridge Company ("DIBCO") appeals from a jury verdict that determined the value of two parcels of land owned by the company and located near the Ambassador Bridge, which connects Detroit to Windsor, Canada. In 1979, the General Services Administration ("GSA"), acting on behalf of the Customs Service, initiated a condemnation action. The crux of this appeal involves a dispute over the proper method of valuing the property at issue, as well as the amount of interest owing on the judgment.
 
 I.
 
 2
 As one might expect, a quarter century of litigation has spawned a number of related judicial opinions. Although the history of this case is extensive, for our purposes the facts as summarized by the district court in 1982 provide a good starting point: Defendant DIBC[O] owns the Ambassador Bridge connecting the United States with Canada, as well as the current bridge plaza on the U.S. side. The plaza, which was built in 1929, is incapable of handling the heavy traffic load. It is particularly congested because U.S. Customs requires approximately 50 percent of the trucks crossing the bridge to submit to a secondary inspection. This means that these trucks must pull over and park. Prior to the condemnation of the land in question, trucks were required to park on the present plaza to await secondary inspection, causing traffic congestion, long waits, and dangerous conditions.
 
 
 3
 United States v. Certain Land Situated in the City of Detroit, 547 F.Supp. 680, 682 (E.D.Mich.1982). GSA sought to obtain three parcels of land located near the bridge through eminent domain. Id. DIBCO owned two of the parcels, which it had acquired in the 1970s with an eye towards alleviating bridge congestion.[1] The larger of the parcels, which it purchased for $1.2 million, had housed a truck terminal used by the previous owner, Overland-Western Corporation.
 
 
 4
 Before purchasing the Overland parcel, DIBCO informed GSA of its intentions, and the agency responded favorably on behalf of the Customs Service, which contemplated leasing space on the property to carry out secondary inspections. After negotiations between DIBCO and GSA broke down, however, GSA filed a Declaration of Taking in 1979 and took possession of the property in 1980, even though it did not move secondary inspections there until 1982.
 
 
 5
 Initially, GSA valued the two parcels at $828,000, which DIBCO points out was less than it had paid to acquire the larger parcel three years earlier. In any event, the district court ordered that amount deposited with the clerk of court when GSA assumed control over the property; that sum was paid to DIBCO in February 1980. Since then, the company has sought further compensation through litigation and its attendant settlement negotiations. An opinion of this court issued three years ago picks up the story:
 
 
 6
 In 1991, the United States and DIBCO agreed to settle the condemnation proceeding. They agreed to a memorandum of agreement ("MOA") under which the United States agreed to enlarge the scope of its expansion and condemn third party property, including the totality of a lot owned by Commodities Export Co. and Walter H. Lubienski ("Commodities"). DIBCO agreed to compensate the United States for the costs of condemnation. DIBCO claims that the MOA gave it the right to be consulted regarding the costs of condemnation, and that it only required DIBCO to pay condemnation costs that were reasonable in light of federal regulations.
 
 
 7
 In 1996, the United States brought a condemnation action against Commodities. DIBCO's counsel was in attendance at conferences in that action at which the United States indicated that it would not seek to condemn the entirety of Commodities' land. DIBCO regarded the failure to condemn all of Commodities' land as a breach of the MOA, but it did not seek to intervene in this condemnation proceeding. Instead, DIBCO sought to reopen the 1979 condemnation action on the grounds that the MOA had been breached. The 1979 action went to trial, and on February 21, 2002, a jury awarded DIBCO nearly $4.1 million in compensation for its land.
 
 
 8
 United States v. Certain Land Situated in the City of Detroit, 361 F.3d 305, 306-07 (6th Cir.2004).
 
 
 9
 As indicated above, the suit that has generated this appeal was tried to a jury in 2002. In addition to the trial itself, the district court issued two opinions that are at the heart of this appeal. The first, United States v. Certain Land Situated in the City of Detroit, 188 F.Supp.2d 747 (E.D.Mich.2002), memorialized the court's ruling on contested motions issues, including theories of valuation; the second, United States v. Certain Land Situated in the City of Detroit, 286 F.Supp.2d 865 (E.D.Mich.2003), concerned the amount of interest due on the judgment.
 
 
 10
 The jury returned a verdict awarding DIBCO $4,098,174.00, which the company contends is inadequate. After the verdict, the parties disagreed upon the amount of interest owed to DIBCO on the difference between the jury award and the amount that the United States had paid in the course of the litigation. The district court held that the proper calculation of the interest owed on the deficiency is based upon the Declaration of Taking Act, 40 U.S.C. § 258a.[2] The United States then deposited $15,683,327.05 with the district court clerk to fulfill the judgment. This appeal followed.
 
 II.
 
 11
 
 1. Did the district court err in limiting the theories that the jury could consider when calculating its compensation award?
 
 
 
 12
 Because "it has been long settled that there is no constitutional right to a jury in eminent domain proceedings," it is not the Seventh Amendment but Rule of Civil Procedure 71A that controls how the district court resolves claims like the one before us. United States v. Reynolds, 397 U.S. 14, 18-19, 90 S.Ct. 803, 25 L.Ed.2d 12 (1970). Rule 71A(h) provides for "a trial by jury of the issue of just compensation" under certain conditions; except for just compensation, however, "[t]rial of all issues shall otherwise be by the court." The Court in Reynolds construed the scope of the jury's power as follows:
 
 
 13
 [W]e think the Rule's basic structure makes clear that a jury in federal condemnation proceedings is to be confined to the performance of a single narrow but important function — the determination of a compensation award within ground rules established by the trial judge.... [W]hen a jury is afforded, the sweeping language of the final sentence of the Rule discloses a clear intent to give the district judge a role in condemnation proceedings much broader than he occupies in a conventional jury trial. It is for him to decide "all issues" other than the precise issue of the amount of compensation to be awarded. It follows that it is for the judge to tell the jury the criteria it must follow in determining what amounts will constitute just compensation, and that in order to do so he must decide the "scope-of-the-project" issue as a preliminary matter.
 
 
 14
 Reynolds, 397 U.S. at 20, 90 S.Ct. 803. The issue in Reynolds concerned whether certain lands condemned by the government were within the original "scope of the project" — the construction of a reservoir. Id. at 18, 90 S.Ct. 803. Although the property owners argued that the "scope of the project" presented a jury question, the Court held otherwise. Id. at 20, 90 S.Ct. 803.
 
 
 15
 Analogously, DIBCO takes the position that the condemned property effectively constituted part of the Ambassador Bridge. If viewed in this light, then the condemnation represents a partial taking, justifying severance damages. As set out below, the district court elected to exclude certain valuation evidence that DIBCO introduced from consideration by the jury. The company takes issue with the following reasoning of the district court:
 
 
 16
 DIBCO seeks to offer evidence of (1) lost profits allegedly suffered by the Bridge and/or (2) the diminution in the value of its property after the taking (i.e., the difference between the before and after taking value of the Bridge and the adjacent taken property) contending that the "highest and best use" of the condemned parcel of property adjacent to the bridge is its use as part of the Ambassador Bridge. In support of its position regarding severance damages and diminution of value, DIBCO relies principally upon United States v. 104 Acres, more or less in Keeler Township, Van Buren County, 666 F.Supp. 1017, 1026 (W.D.Mich.1987), contending that the relevant facts of this action "are identical" to those in the Van Buren County case.
 
 
 17
 In Van Buren County, the Government took in fee a small part of one parcel of defendant's property and an easement over a substantial part of the remainder of that parcel. The property was used for farming, specifically for growing corn. The parcel had a central pivot irrigation system on it. It was undisputed that the highest and best use of the property was as a farm.
 
 
 18
 ....
 
 
 19
 Van Buren is readily distinguishable from the instant case because in Van Buren, the adjacent property was at the time of the taking being put to an integrated unitary use with the condemned parcel, and as a consequence, the property owner was entitled to "severance damages" for diminution of the value of the adjacent land in addition to the fair market value of the property actually taken. Here, there is no dispute that the condemned property was not at the time of the taking being used as an integrated part of the Bridge.
 
 
 20
 ....
 
 
 21
 The weight of authority ... is that there must be evidence that such an integrated, unitary use with an adjacent parcel of land must have existed at the time of the taking. See United States v. 1,162.65 Acres of Land, 498 F.2d 1298, 1300 (8th Cir.1974) ("[T]he applicable working rule requires that if, on the facts of a particular case, it is determined that the particular tracts condemned were at the time of taking, in fact being used and devoted to a unitary use together with another tract, the tracts taken and the tracts not taken must be considered as a single unit in both the before and after valuations.") It is undisputed here that at the time of the taking there was no unity of use with respect to the condemned property and DIBCO's Ambassador Bridge property.
 
 
 22
 Certain Land, 188 F.Supp.2d at 749-51 (citations omitted) (emphasis original). Because the district court concluded that no "unitary use" of the property existed at the time of the taking, it disallowed severance damages. Id. at 753-54.
 
 
 23
 We begin with the uncontested proposition that "[t]he constitutional requirement of just compensation derives as much content from the basic equitable principles of fairness, as it does from technical concepts of property law." United States v. Fuller, 409 U.S. 488, 490, 93 S.Ct. 801, 35 L.Ed.2d 16 (1973) (citation omitted). Fairness means that the owner of condemned property "is entitled to be put in as good a position pecuniarily as if his property had not been taken. He must be made whole but is not entitled to more." Olson v. United States, 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236 (1934); See Reynolds, 397 U.S. at 16, 90 S.Ct. 803. In making this determination, the following considerations apply:
 
 
 24
 Just compensation includes all elements of value that inhere in the property, but it does not exceed market value fairly determined. The sum required to be paid the owner does not depend upon the uses to which he has devoted his land but is to be arrived at upon just consideration of all the uses for which it is suitable. The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered, not necessarily as the measure of value, but to the full extent that the prospect of demand for such use affects the market value while the property is privately held.
 
 
 25
 Olson, at 255, 54 S.Ct. 704 (citation omitted).
 
 
 26
 DIBCO contends that, under these principles, the district court erred when it instructed the jury as follows:
 
 
 27
 I want to talk to you about this notion of highest and best use. In fixing the fair market value of the property in question, you should consider the highest and best use to which the property was reasonably adaptable at the time of the taking or in the reasonably near future thereafter.
 
 
 28
 ....
 
 
 29
 Mere possibility of such use or adaptation is not enough....
 
 
 30
 Mere geographical or physical adaptability, alone, is not enough.
 
 
 31
 ....
 
 
 32
 [Y]ou've heard evidence from The Bridge Company that the highest and best use was to be combined with the bridge property next door and used for overall bridge operations.
 
 
 33
 However, as I told you earlier, I have now instructed you that you may not consider this use for the bridge.
 
 
 34
 In other words, you may not consider the integrated use of the property that [DIBCO's expert] Mr. Walsh testified to. You may consider other uses which you find from the evidence that meets the tests, and the rules I've explained in these instructions, including the proximity of the condemned property to the bridge.
 
 
 35
 The district court explained the reason for its approach in these terms:
 
 
 36
 [T]he evidence presented in this case shows that the Government's intention to take the property was made public prior to the time that DIBCO purchased the parcels of property at issue. DIBCO had specific knowledge of the intended taking at least as of December 1976. [See Plaintiff's Ex. 27, letter from DIBCO president Roy Lancaster to Dennis Keilman, Director of the GSA Space Management Division, acknowledging DIBCO's awareness of the prospectus for the taking submitted by GSA to Congress.] Moreover, any integrated use of the condemned property with the Bridge was dependent upon the City of Detroit's vacating of 21st Street and Nash Sogoian's sale of his parcel of land to DIBCO. As of the date of taking, no steps were taken by DIBCO to effectuate the vacation of 21st Street and Defendant's own witnesses testified that Sogoian flatly refused to sell his property to DIBCO. Furthermore, even DIBCO president, Roy Lancaster, admitted in his deposition that any integrated use of the property with the Bridge property was merely a "possibility." [See Lancaster 7/16/84 Deposition, p. 56.]
 
 
 37
 For these reasons, the Court finds that there was no reasonable probability of the property in question being combined and used in conjunction with Defendant's Ambassador Bridge property in the reasonably near future.
 
 
 38
 188 F.Supp.2d at 759.
 
 
 39
 DIBCO finds fault with the conclusion that no unitary usage of the condemned property and the bridge existed at the time of the taking. The company refers us to the passage from Olson cited earlier: "The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered, not necessarily as the measure of value, but to the full extent that the prospect of demand for such use affects the market value while the property is privately held." Olson, 292 U.S. at 255, 54 S.Ct. 704 (emphasis added). DIBCO relies upon the following evidence to back up its contention that severance damages were justified: the property could be used to alleviate traffic congestion on the bridge's plaza; condemnation eliminated this option; traffic congestion diminished the income-producing potential of the bridge; and there was no similar property available for purchase.
 
 
 40
 DIBCO likens its situation to that of a Kentucky farmer whose land was condemned for a reservoir. The district court refused to allow the jury to consider the best use as resale as residential lots. We reversed for these reasons:
 
 
 41
 The trial judge must make a preliminary determination that there is factual support for a finding by the jury that the "property is adaptable and needed or likely to be needed in the reasonably near future" for the proposed use. Having found that there is evidence sufficient to support such a finding by the jury, the Court should then leave the question of adaptability and potential development to the jury. He need not be convinced that the landowner has established the development potential of the property for the proposed use by a preponderance of the evidence but only that the evidence is such that a jury could reasonably so find.
 
 
 42
 United States v. 478.34 Acres of Land, Tract No. 400, 578 F.2d 156, 159-60 (6th Cir.1978). Although reasonable minds might reach different conclusions about the evidence, the company contends that, at the very least, it came forward with sufficient facts to allow a jury to consider valuation based upon a "unitary use" or partial takings theory, which in turn would open the door to severance damages.
 
 
 43
 We acknowledge that this is a close question, which may explain why these two parcels of land have generated such spirited litigation. However, as we emphasized at the outset, "other than the precise issue of the amount of compensation to be awarded . . . it is for the judge to tell the jury the criteria it must follow in determining what amounts will constitute just compensation." Reynolds, 397 U.S. at 20, 90 S.Ct. 803. The district court's opinion marshals a number of facts in support of its decision to preclude the jury from considering the valuation theories proposed by DIBCO. Because we detect no error in either its factual findings or in their application to the subsequent jury instructions, we affirm the district court on this issue.
 
 
 44
 
 2. Did the district court err in looking to the Declaration of Taking Act in fixing the appropriate interest rate on the deficiency?
 
 
 
 45
 In an opinion published after trial and briefing by the parties, the district court calculated the interest owed to DIBCO by the government based upon the Declaration of Taking Act, 40 U.S.C. § 258a ( re-codified as 40 U.S.C. § 3114). Certain Land, 286 F.Supp.2d 865 (E.D.Mich.2003). Because the determination of a reasonable rate of interest for just compensation is a finding of fact, our review is for clear error. Schneider v. County of San Diego, 285 F.3d 784, 790 (9th Cir.2002) (citing United States v. 50.50 Acres of Land, 931 F.2d 1349, 1354 (9th Cir.1991)).
 
 
 46
 The district court began by noting that "interest is to be calculated based only upon the deficiency, and not upon the amounts previously paid to the court" by the government. Id. at 867. After reviewing the history of deposits made by the government, the court determined the deficiency:
 
 
 47
 [T]he Court will amend the Judgment in this matter to reflect the Government's previous deposits of $828,000.00 and $412,000.00 with the Court. These sums will be deducted from the jury award and, therefore, the principal amount of the Amended Judgment will be $2,858,174.00. Pursuant to Section 258a of the Declaration of Taking Act, it will be this sum upon which interest will be calculated.
 
 
 48
 Id. at 868.
 
 
 49
 In choosing to proceed under the Declaration of Taking Act, the court looked to the mandatory language of § 258a: "[J]udgment shall include, as part of the just compensation awarded, interest in accordance with section 6 [258e-1] of this Act on the amount finally awarded as the value of the property as of the date of taking, from said date to the date of payment; but interest shall not be allowed on so much thereof as shall have been paid to the court." Section 258e-1 provided in relevant part as follows:
 
 
 50
 Where the period for which interest is owed is more than one year, interest for the first year shall be calculated in accordance with paragraph (1) and interest for each additional year shall be calculated on the combined amount of the principal (the amount by which the award of compensation exceeds the deposit referred to in section 258a of this title) and accrued interest at an annual rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar year week preceding the beginning of each additional year.
 
 
 51
 40 U.S.C. § 258e-1(2) (now 40 U.S.C. § 3116(a)).
 
 
 52
 DIBCO argued below that the Declaration of Taking Act set an inadequate rate to compensate the company for the lengthy delay in receiving payment. Instead, it proposed alternative rates, which the district court rejected for these reasons:
 
 
 53
 The legislative history of this Act makes clear that the intent of Congress in enacting the 1986 amendments was to provide for uniformity in the district courts in their determination of the appropriate rate of interest to be applied in condemnation cases. As stated in the House Judiciary Committee's Report which accompanied the bill (H.R.5363) which ultimately became law:
 
 
 54
 The purpose of H.R. 5363 is to amend the interest provisions of the Declaration of Taking Act (40 U.S.C. 258a) to establish a uniform statutory rate of interest in eminent domain cases.
 
 
 55
 See H.R. Rep. 99-914, reprinted in 1986 U.S.Code Cong. & Admin. News 6202 (emphasis added).
 
 
 56
 The Report further noted that "this legislation will solve a long-standing problem encountered in eminent domain cases brought in district courts under the Declaration of Taking Act regarding the appropriate rate of interest." Id. at 6203. As explained in the House Report, the Declaration of Taking Act, which was enacted in 1931, provided for interest at a rate of 6 percent per annum. This interest rate had not been changed since the statute was enacted. Id. In endorsing H.R. 5363, the Congressional Budget Office noted:
 
 
 57
 Currently the interest rate applicable to the taking of real estate is set by law at 6 percent. The courts generally consider this 6 percent rate to be a minimum, and usually apply a higher interest rate (based on market rates). This bill would make their application uniform and consistent among the courts. It would also eliminate the treatment of the interest rate as a question of fact to be determined by the courts.
 
 
 58
 Id. at 6204 (emphasis added).
 
 
 59
 Given the mandatory language of the statute and the very clear legislative history, the Court finds that applying any rate other than the statutory rate formulated in § 258e-1 would contravene the clear intent of Congress. The Court is unaware of any precedent or doctrine which provides a sound jurisprudential rationale that would permit the Court to ignore such a clear legislative mandate. The fact that determining just compensation is a judicial function does not render calculation of interest on that compensation a judicial function where Congress has clearly indicated its intention to fully occupy the field in this area.
 
 
 60
 ....
 
 
 61
 [T]he Court finds that the statutory rate of interest set forth in § 258e-1 provides DIBCO what a reasonable and prudent investor would earn while investing though guaranteeing the safety of the principal. The interest rate provided in § 258e-1 is not a fixed rate; it is a fluctuating rate that tracks the upward and downward movement of market interest rates, generally. Thus, this method of determining interest is a market-driven rate. Second, an investment in U.S. Treasury securities is safe because an investor will not lose the principal underlying the investment, as he would risk doing in the stock or bond market.
 
 
 62
 Certain Land, 286 F.Supp.2d at 870-71 (citation omitted).
 
 
 63
 DIBCO points out that, during the time frame at issue, the application of the statutory interest rate generated much less money for the company than several other rates that it proposed to the district court. The statutory rate generated $12,873,452 of pre-judgment interest, while a 30-year bond rate would have produced $40,732,947 on the same amount — a difference of $27,499,495.
 
 
 64
 While it is true that DIBCO would have been better off had the money been tied to different indices over the period in question, there is nothing to suggest that the district court's adoption of the statutorily required rate constituted clear error; in light of the "reasonably prudent investor" standard, we decline to reverse the district court's decision with respect to interest rates.[3]
 
 III.
 
 65
 The judgment of the district court is affirmed in all respects.
 
 
 
 Notes:
 
 
 *
 The Honorable Walter H. Rice, United States District Judge for the Southern District of Ohio, sitting by designation
 
 
 [1]
 The third parcel, which was owned by Nash Sogoian, separated the parcels owned by DIBCO. It was acquired in the same condemnation proceeding; it is not at issue in this appeal
 
 
 [2]
 The statute has been re-codified. References in this opinion are to the codification sections cited by the district court
 
 
 [3]
 DIBCO also contends that it should have been afforded an evidentiary hearing on the issue. Given the amount of material submitted by the parties, however, we detect no abuse of discretion on the part of the court in denying an evidentiary hearing